*In re* VÍCTOR RAMOS ACEVEDO, JOSÉ RAFAEL VÁZQUEZ DEYNES y FRANCISCO ARROYO GONZÁLEZ, querellados.

*Número:* O-75-481    *Resuelto:* 29 de septiembre de 1977

*Miriam Naveira de Rodón, Procuradora General, Roberto Armstrong, Jr., Procurador General Interino, Américo Serra* y *Ronaldo Rodríguez Ossorio, Procuradores Generales Auxiliares,* abogados de El Pueblo; *Félix Ortiz Juan, Elpidio Arcaya* y *Julio Williams Andino,* abogados del Lcdo. Víctor Ramos Acevedo; *José A. Andreu García,* abogado del Lcdo. José R. Vázquez Deynes; *Enrique González* y *Raúl Dávila Rivera,* abogados del Lcdo. Francisco Arroyo González.

PER CURIAM: Nuestro dictamen final en la querella de epígrafe exige que reproduzcamos íntegramente el Informe rendido por el Comisionado Especial Hon. Pedro Santos Borges, el cual aprobamos[1] en su totalidad por estar ampliamente sostenido en la evidencia testifical y documental desfilada.

"En octubre 17 de 1975 el Procurador de Puerto Rico formuló ante el Honorable Tribunal Supremo una querella contra los Lcdos. Víctor Ramos Acevedo, José Rafael Vázquez Deynes y Francisco Arroyo González conteniendo tres cargos en los que se les imputa haber observado una conducta inmoral, ilegal e impropia en el desempeño de sus funciones como abogados, consistente en haberse dirigido a Gilberto Hernández Díaz, quien era testigo de cargo en una causa criminal instada contra

---

[1] Las dos objeciones formuladas por el Procurador General a dicho Informe son improcedentes. El reparo a la determinación fáctica número 4 en el sentido de que los abogados querellados en varias ocasiones ". . . le informaron a Gilberto que su propósito era llevarle al Fiscal García las grabaciones . . ." es inmeritorio, encontrando apoyo dicha conclusión en la prueba. De igual modo no es válida la objeción en la que el Comisionado concluye que Gilberto Hernández ". . . no le tiene ni nunca le ha tenido miedo a nadie, ni a sus amigos y que se trata de un individuo difícil de ser amedrentado." Esta conclusión está basada en la prueba aportada y en el historial delictivo de dicho testigo.

unos clientes suyos, y presionaron y/o instigaron y/o amenazaron al referido testigo para que éste alterara su testimonio prestado bajo juramento ante funcionarios competentes con el fin de favorecer a los acusados representados por ellos, constituyendo dicha conducta una intervención indebida con un testigo de la parte contraria, todo en violación del Canon 5 del Código de Ética Profesional y el Preámbulo de dichos cánones.

Los abogados querellados contestaron la querella y admitieron haber visitado y entrevistado al referido testigo de cargo, pero niegan que en dichas entrevistas presionaran y/o instigaran, y/o amenazaran a dicho testigo de cargo. En contrario alegan que sus actuaciones estuvieron enmarcadas en el legítimo ejercicio de su deber de investigación y preparación para el desempeño de sus funciones en la defensa de sus representados.

En 15 de enero de 1976 este Honorable Tribunal Supremo, por resolución dictada al efecto, designó al suscribiente Comisionado Especial para la vista de este caso.

En 29 de dicho mes y año dictamos una orden señalando el día 25 de febrero para celebrar una conferencia con antelación a la vista de las querellas. En dicha vista ordenamos a la Operadora de Máquinas de grabación, Sra. Casado de Cora, que transcribiera lo contenido en las cintas magnetofónicas entregadas por los abogados de la Oficina del Procurador General y por el querellado Lcdo. Víctor Ramos Acevedo al Secretario de este tribunal. Durante la vista la Sra. Casado informó que luego de leer las transcripciones de las referidas cintas hechas en las oficinas de la División de Investigaciones Criminales y de oir el contenido de las cintas había determinado que una parte considerable de lo que aparecía grabado no había sido transcrito. Ella procedió a transcribir la totalidad de las grabaciones. La porción no transcrita cubrió cuarenta páginas adicionales a la transcripción original. (Véase T.R.—páginas 333 a 337—Declaración de la Operadora, Sra. Luz C. Casado.)

Procedimos a señalar la vista formal del caso y esta comenzó a celebrarse el día 18 de marzo y se prolongó durante los días 19, 23 y 24 de dicho mes.

La parte querellante presentó como prueba testifical cuatro testigos y como prueba documental cuatro piezas de evidencia y dos cintas magnetofónicas en las que se grabaron la segunda y la tercera entrevista entre los letrados querellados y el testigo de cargo Gilberto Hernández Díaz.

La parte querellada presentó prueba testifical consistente en los testimonios de seis testigos y diecisiete piezas de evidencia documental, más las cintas magnetofónicas antes indicadas.

Antes de entrar a formular nuestras determinaciones de hecho creemos que es conveniente exponer algunos de los acontecimientos que se sucedieron con anterioridad a la intervención de los abogados en el presente caso.

## ANTECEDENTES

1. Entre las once y doce de la noche del día 15 de mayo de 1974 se desarrolló un incendio en un edificio sito en el Centro Industrial de La Cerámica, en el Barrio Sabana Abajo de Carolina, P.R. propiedad de la San Juan Realty Corporation y el cual estaba ocupado en calidad de arrendamiento por Delta International Corporation, donde se explotaba un negocio de artículos eléctricos cuyos dueños eran los señores Charles, Isidoro y Moisés Benmuhar. El Vicepresidente a cargo de ventas y también Gerente de Ventas era José A. Tió Corzo. Toda la mercancía que se almacenaba dentro del edificio quedó destruida y dicha estructura quedó considerablemente deteriorada.

2. La propiedad y el negocio de Delta International Corporation estaba cubierta con una póliza de seguros contra incendio y otros riesgos con la compañía denominada Commercial Union Assurance Co.

El abogado que intervino con la compañía de seguros fue el Lcdo. José Rafael Vázquez Deynes quien desde hacía bastante tiempo sostenía relaciones profesionales con Delta International. Después de varias reuniones con los auditores y funcionarios de Delta y su abogado Vázquez Deynes con los funcionarios de la compañía aseguradora, ésta aceptó pagar $1,319,084.00 como daño a la propiedad y $180,828.86 como pérdida por la interrupción del negocio a la Delta.

3. Los funcionarios del Cuerpo de Investigaciones Criminales que de ahora continuaremos llamando por su sigla CIC, sospechando que el fuego fue perpetrado por manos criminales, iniciaron una investigación y en uno de los días del mes de julio de 1974—alrededor de tres meses después de la fecha del incendio, mayo 15 de 1974—detuvieron a Gilberto Hernández Díaz. En 9 de septiembre del mismo año, cerca de dos meses más tarde, lo condujeron a presencia del Fiscal Guillermo García. Allí se le ofreció inmunidad para que se hiciera testigo de cargo,

ya que se le acusaba de ser co-autor, con otros, de robar e incendiar la propiedad [de] Delta International, ofrecimiento que aceptó ya que seguidamente procedió a prestar declaración jurada la que sintetizaremos lo más brevemente que nos sea posible a continuación. (Véase Exh. 10-B, Qdos.)

(A) Expone Gilberto que el 12 de mayo de 1974, un domingo, se reunió en el Caserío Sabana Abajo de Carolina con José A. García Colón, c/p Willy, y con Edgardo Cruz Hernández, c/p Guao y allí Willy les dijo de un robo que se proponía efectuar. Acordaron reunirse de nuevo al otro día, lunes, a las cinco de la tarde.

(B) Cumpliendo lo convenido, se reunieron el lunes a las tres de la tarde en casa de la madre de Guao, Doña Angela Hernández, sita en Villa Palmeras de Santurce. Le acompañaron Felipe Jaime Castro, c/p Pipo Caballo. Cuando llegaron, Willy, acompañado de otros dos muchachos apodados Yiyo y Pantera, les estaban esperando. Willy les informó que todo estaba bien planeado y que no habría error en el caso Delta.

(C) Todos confiaron en lo que decía Willy, pues antes ellos habían cometido robos con él y les había salido bien la cosa. Willy le encomendó a Gilberto que consiguiera los vehículos; y que cuando empezaran el robo, Pantera vigilaría la esquina de la Rohena, Yiyo atendería la esquina de la Texaco y Gilberto haría vigilancia en la otra esquina; que él, Willy y Guao se meterían adentro.

(D) El miércoles 15 de mayo Gilberto y Yiyo fueron a la American Metal Corp., una fábrica ubicada en la Urbanización Industrial 'El Comandante'. Allí Gilberto forzó una venta [ventana] y rompió el candado de una compuerta; Yiyo salió a velar y Gilberto sacó dos vehículos del interior que encontró con las llaves puestas; que uno era un 'truck' con barandas y el otro una camioneta (Panel Delivery). Los llevaron a casa de Guao en Santurce donde llegaron como a las 6:30 PM, y allí encontraron a Willy, Pantera y Guao. Pipo Caballo no estaba porque había caído preso el día antes. Allí acordaron reunirse en Delta a las 7:00 PM. Al llegar a Delta a las 7:20 PM cada uno de ellos sincronizó su reloj a la misma hora.

(E) Antes de salir Willy echó al 'truck' un envase plástico lleno con un líquido, y una soga. Estacionaron los vehículos en la esquina donde doblan las guaguas de la Calle Loíza para Carolina y caminaron hacia la Delta y vieron que, aunque era

de noche, todavía había personal adentro. Ya como a las 9:10 PM todo el personal había abandonado la fábrica.

(F) Cada uno se situó en la esquina que según [*sic*] le correspondía mientras Willy y Guao forzaron los candados y penetraron al interior; que la alarma no sonó. Ellos movieron los vehículos al frente y colocaron cinco cajas que contenían televisores, en cada uno de ellos.

(G) Cuando Willy sacó el envase plástico y la soga del 'truck', Gilberto le preguntó que qué iba a hacer con aquello. Willy no le contestó pero les indicó que se fueran que Guao y él se encargarían del resto.

(H) Gilberto y Yiyo se dirigieron a casa de Guao en Villa Palmeras y allí dejaron las diez cajas con los televisores. Regresaron para dejar los vehículos de donde los habían hurtado. En el camino oyeron las sirenas de los bomberos que iban de distintos lugares y vieron que había fuego en 'La Cerámica.' Después de dejar los vehículos cada uno siguió su camino. De la Delta salieron poco antes de la media noche.

(I) En 18 de mayo—sábado—se dirigió a la cuadra de San Antón y allí encontró a Willy hablando con un señor mayor de edad, blanco, bajito y gordito, de pelo bueno. Gilberto no oyó lo que decían, pero luego Willy vino hacia él y le dijo que aquel era el tipo en quien debían confiar y cooperar con él.

(J) De la cuadra Gilberto se fue para casa de Guao, quien le dio un sobre en el que aparecía su nombre escrito y al abrirlo encontró la suma de trescientos dólares en billetes de $20.00, $10.00, $5.00 y de $1.00. Guao le dijo que eso era en pago del trabajo que había hecho.

(K) Al siguiente día—domingo—luego de llevarse dos de los diez televisores, regresó a su casa y no volvió a casa de Guao. Uno de los televisores era en colores y lo vendió en $85.00. El otro, en blanco y negro, lo vendió en $65.00. No dijo a quienes se los vendió.

4. Ocho días después de la anterior declaración, o sea, en 17 de septiembre de 1974, fue de nuevo conducido desde el Anexo de Miramar a las oficinas del Fiscal Guillermo García con el propósito de ampliar la anterior declaración. Le declaró al fiscal que se le había olvidado decir que el hombre que les habló para cometer el robo les dijo donde exactamente estaba el cargamento, el cual no estaría custodiado, que sería fácil abrir las puertas, y que la alarma no sonaría. (Exh. 10-C, Qdos.)

5. Gilberto Hernández Díaz fue detenido en julio de 1974 y recluido en el Anexo de Miramar. En la madrugada del día 9 de septiembre de ese año, mientras dormía en su celda fue atacado y herido con un arma blanca en el cuello y las manos. Fue conducido a las 7:00 AM a la enfermería de la Penitenciaría Estatal de Río Piedras donde fue atendido y curado. Del presidio lo condujeron a presencia del Fiscal García García donde prestó la declaración que antes hemos resumido. Obsérvese que al fiscal no le comentó sobre, ni le describió el incidente de las puñaladas, ni el fiscal, según aparece del documento, inquirió que le ocurría en las manos y en el cuello. (Véanse Exhs. 10-B y 6, Qdos.)

6. Descansando en esa declaración y en declaraciones prestadas por los testigos de cargo Edgardo Cruz Hernández (Guao), Felipe Jaime Castro González (Pipo Caballo), Benjamín Acosta, representante de la compañía aseguradora y Luis Acebal, Secretario de Delta International Corporation, el agente especial del CIC, Alberto Ortiz, radicó dos denuncias por Infracción a los Artículos 478 y 398 del Código Penal contra Charles, Isidoro, Moisés, de apellidos Benmuhar, de José A. Tió Corzo y de Angel Luis García Colón c/p Willy, José Manuel Torres c/p Chucho, y Marcos Cruz Canales c/p Pantera. Contra Charles, Isidoro y Moisés Benmuhar y José A. Tió Corzo formuló otra denuncia por Infracción al Artículo 479 del Código Penal.[1] Estas denuncias fueron juradas en octubre 8 de 1974.

7. Sometidas las denuncias a la consideración del Honorable Rurico Rivera, Juez de Distrito de la Sala de Investigaciones, este magistrado determinó causa probable y expidió órdenes de arresto contra los acusados, fijándole una fianza de $5,000.00 a cada uno de ellos para que pudieran permanecer en libertad provisional. La vista preliminar se señaló para el día 25 de octubre de 1974.[2] Es en esta etapa de los acontecimientos que

---

"Escolio [1]

Art. 398: El acto voluntario de pegar fuego a un edificio ajeno con intención de destruirlo.

Art. 478: Pegar fuego, dañar y/o destruir propiedad asegurada contra incendio con el propósito de defraudar o perjudicar al asegurador.

Art. 479: Presentar una declaración falsa en virtud de una póliza de seguro."

"Escolio [2]

Esta vista fue suspendida y transferida para el día 8 de noviembre de 1974."

estamos considerando que nuevamente interviene el Lcdo. José Rafael Vázquez Deynes, esta vez como abogado defensor de los hermanos Benmuhar y de Tió Corzo.

8. Creemos que es conveniente pesar y analizar los diversos testimonios de Gilberto Hernández Díaz y ponernos en condiciones de medir su aptitud para decir la verdad o para mentir.

Este testigo tiene un largo historial de delincuencia desde que contaba dieciséis años de edad, y ha sido arrestado, sentenciado y confinado por delitos de hurto, hurto de uso, robo, escalamiento en segundo grado y primer grado en innumerables ocasiones. Al preguntarle que cual era su oficio contestó que se dedicaba a robar.

El fiscal General Especial Alcides Oquendo señaló en el informe que rindió al Honorable Gobernador, que el testigo que se utilizó para establecer los cargos imputados a los acusados era de dudosa credibilidad y desconfiable. La Honorable Procuradora General, Sra. Naveira de Rodón, hizo constar y reconoció que de los hechos investigados por su oficina surgen contradicciones e incongruencias que restan credibilidad a los testigos de cargo. Y añade que la evidencia sometida por el ministerio público era de dudosa confiabilidad y difícilmente suficiente para imputar delito alguno. (Véase T.R., página 464, línea 4; Informe del Procurador General, página 22, línea 3, et seq.)

A un comentario formulado por el Lcdo. Arroyo González (Exh. 1 de ambas partes, 2da. entrevista, página 63) surgió el siguiente diálogo:

'Lcdo. Arroyo: Eso quiere decir que tú acostumbras decir tus paquetitos de vez en cuando?

Gilberto: ¿Ah?

Lcdo. Arroyo: Que tú acostumbras decir tus paquetitos de vez en cuando.

Gilberto: No, seguro, tengo que defenderme, pero que mientras uno esté "aprisionao" si uno declara primero que yo, yo no sé lo que aquel me diga a mí.

Lcdo. Arroyo: Es decir que tú declaras lo que a tí te convenga, no la verdad.

Gilberto: Lo que más me defienda.' (³)

_____

"Escolio (³)

Obsérvese que Gilberto describe y admite su participación en el planeamiento y ejecución del robo y del incendio de la Delta junto a Willy, Yiyo

Continuaremos puntualizando las inconsistencias y contradicciones en que él incurrió en sus diversas declaraciones y manifestaciones. Veamos:

(a) En su declaración de febrero 14 de 1974 [*sic*] ante el agente Angel Luis Ocasio (Exh. 10, Qdos.) sobre los mismos hechos depone que en mayo 12 de 1974 unos amigos lo fueron a buscar y le invitaron a perpetrar un robo. Contrario a lo que declaró en 9 y 17 de septiembre de ese año ante el fiscal García, manifestó que él aceptó la proposición y luego fue a la cuadra de San Antón y allí encontró a Willy hablando con José A. Tió. Siguieron hablando los tres sobre el robo y el incendio de la fábrica; que Tió le dijo que le pagaría bien; que luego cuando todo estaba listo, se dirigieron a la fábrica; que Tió los estaba esperando dentro de la fábrica; que cuando todo estaba terminado él se dirigió con los televisores robados a Barrio Obrero y cuando regresó ya la Delta estaba en fuego; que después de hacer el trabajo se vieron otra vez en la fábrica y allí estaban los tres hermanos Benmuhar, José A. Tió y Willy; que acordaron que él sometiera el caso a la corte y se hiciera testigo para luego cometer falta y cambiar la declaración en corte; que el propósito era para coger un seguro que la compañía pagaba, pues Tió le dijo que la compañía había sufrido muchas pérdidas; que después del trabajo Tió le dio $500.00; que después que Tió le pagó no lo vio más; y que cuando fue a juicio cambió la declaración para ocultar a los acusados pues todo había sido planeado así. (⁴)

(b) En su testimonio vertido en la vista celebrada ante nos, confiesa que es falso lo que declaró ante el Fiscal García en 17 de septiembre de 1974 en el sentido de que el hombre que habló con ellos les dijo exactamente donde estaba el cargamento, que este

y Pantera, o sea, los tres compañeros de él que fueron acusados. A él no lo acusaron porque aceptó hacerse testigo de cargo cuando le ofrecieron y le concedieron inmunidad si declaraba en contra de ellos. Naturalmente a él le convenía 'lo que más le defendiera'. La inferencia de que él protegiera la concesión de esa inmunidad exponiendo hechos que no eran ciertos resulta ser sumamente razonable."

"Escolio (⁴)

Esta declaración se discute in extenso durante el contrainterrogatorio que aparece a las páginas 151 a 161 en la Transcripción de Récord. A las páginas 245 a 247 (página precisa 247, línea 18) Gilberto confiesa que es falso que Tió le diera $500.00, como declaró ante el agente Ortiz Ocasio y que sólo recibió $300.00, que según dice unas veces fueron entregados por Doña Angela y otras que le fueron dados por Guao."

no estaba custodiado, que la puerta sería fácil de abrir y que no iba a sonar la alarma. (Véase página 151, líneas 2 a 6, T.R.)

(c) En el último párrafo de su declaración de septiembre 9, 1974, afirma Gilberto que el hombre que estaba en compañía de Willy en 18 de septiembre, y que luego ha identificado como José A. Tió, era ya mayor de edad, bajito y gordito, blanco y de pelo bueno.

En la vista celebrada en 23 de marzo de 1976 los querellados trajeron ante nos a José A. Tió Corzo con el propósito de que tuviéramos la oportunidad de observarlo en cuanto a su apariencia física. Este individuo tiene seis pies de estatura, se ve, aunque algo maduro, relativamente joven y pesa doscientas treinta libras. (Véanse páginas 328 y 329 de la Transcripción del Récord.)

(d) En su primera declaración ante el Fiscal García (Exh. 10-B, Qdos.) Gilberto dijo que entre él y Yiyo llevaron los diez televisores a casa de Doña Angela. El sábado siguiente fue a casa de ésta, quien le entregó el sobre con trescientos dólares, al que antes nos hemos referido, y al despedirse se llevó dos televisores, uno en colores y el otro en blanco y negro, dejando allí ocho de ellos. Vendió el blanco y negro en $65.00 y el de colores en $85.00. Nunca dijo a quienes se los vendió. Después de ese día no volvió a casa de Doña Angela.

En la declaración prestada ante el fiscal Oquendo en 12 de agosto de 1975, cuando este funcionario le preguntó qué había hecho con los televisores, él le contestó que los que a él le tocaron los había vendido a diferentes personas, que no sabía el nombre de éstas pero que sabía donde vivían.

En su testimonio ante nos dijo que había vendido los cinco televisores a diferentes personas cuyos nombres no sabía. (T.R. páginas 194, 195, 196.)

(e) En la declaración prestada ante el fiscal Oquendo, (Exh. 10-E, Qdos., página 14) Gilberto expone que vio a los Benmuhar y a Tió en la cuadra Matienzo de San Antón, pero niega que él se combinara con los Benmuhar para someter el caso y luego añade que Willy le dijo a él que lo que querían era que 'yo sometiera el caso para ellos cobrar el seguro'. Esa conversación no se efectuó en presencia de los Benmuhar ni de Tió, porque Willy lo llamó aparte para conversar con él. Willy no estuvo conforme con lo que se pretendía por los Benmuhar ni él lo estuvo tampoco.

Contrario a lo que antecede, declara ante nos que esa conversación fue discutida por los cinco que estaban presentes los tres Benmuhar, Tió, él y Willy, y que no aceptaron la proposición ofrecida. (Véase T.R. páginas 190 a 194.)

(f) En la página 241, T.R. admite Gilberto que acusó a Marcos A. Cruz Canales, a Felipe Jaime Castro y a César González del delito de Escalamiento en Primer Grado. (Véase Exh. 2, Qdos. y T.R. páginas 241-243.) La vista preliminar se celebró en 21 de octubre de 1975 ante la Honorable Juez Blanca Iris Bonilla y al ser Gilberto llamado él se negó a testificar cuando fue informado u oyó que las declaraciones prestadas en la investigación de los hechos no fueron juradas. (T.R. páginas 439-442.)

En 20 de mayo de 1974 se formuló denuncia contra Angel García Colón (Willy) figurando como testigos de cargo Gilberto Hernández Díaz e Ismael Rivera. Obsérvese que Gilberto se prestó a ser testigo de cargo contra Willy cinco días después de la fecha en que ocurrió el fuego en la Delta. El delito que se le imputaba al acusado fue de Hurto Mayor—robarse un carro. Llamado el caso para vista preliminar ante el Honorable Juez Juan J. Sánchez, Willy se declaró culpable y se le sentenció a cumplir una condena de tres meses de cárcel. Ante nos negó que hubiese servido de testigo de cargo o que hubiese prestado declaración alguna ante nadie. (Véase Exh. 9, T.R. páginas 243-245.) (5)

(g) Gilberto declaró por primera vez ante el Procurador General y sus auxiliares Lcdos. Serra y Orlandi en noviembre 12 de 1975.

En esa declaración dijo que luego de terminada la segunda entrevista él llamó al Fiscal García García y le explicó lo que estaba pasando.

El Fiscal García García, declarando ante nos y contestando una pregunta del Lcdo. Andreu García, dijo lo siguiente:

"Escolio (5)

Los querellados ofrecieron esta evidencia no sólo para establecer las contradicciones en que incidió el testigo entre lo que había sucedido en los casos citados y lo declarado ante este tribunal en relación con los mismos, sino para evidenciar que Gilberto no tuvo temor en servir como testigo de cargo contra Willy para acusarlo de Hurto Mayor, delito por el cual fue sentenciado."

'Fiscal García García:

Yo no recibí llamada telefónica alguna de este testigo en relación a ese hecho ni a ningún otro hecho, es decir, nunca recibí ninguna llamada telefónica del testigo Gilberto Hernández Díaz.

Lcdo. Andreu García:

O sea, que nunca recibió querella de que abogado o persona alguna lo estuviera amenazando para que cambiara su declaración.

Fiscal García García:

No es correcto, no tuve ninguna llamada telefónica de este testigo. (T.R. páginas 325–326.)'

Considerada en conjunto la evidencia presentada por ambas partes y admitida por este Comisionado Especial que suscribe, las siguientes son nuestras:

## DETERMINACIONES DE HECHOS

1. La primera gestión del Lcdo. José Rafael Vázquez Deynes fue conseguir las fianzas fijadas por el Tribunal a los acusados que él representaba. En ese mismo día se comunicó con el Lcdo. Víctor Ramos Acevedo y convinieron en asumir juntos la defensa de los acusados Charles, Moisés e Isidoro Benmuhar, en lo sucesivo hermanos Benmuhar, y de José A. Tió Corzo. Procedieron a visitar a los co-acusados José Manuel Torres c/p Chucho unas veces y otras Yiyo, quién se encontraba preso en la Cárcel de la Princesa. A base de lo que éstos le informaron, decidieron ir a la Penitenciaría de Río Piedras a entrevistar al otro acusado quien según las denuncias se llamaba José A. García, pero no encontraron a nadie conocido por ese nombre.

2. Al siguiente día, 10 de octubre, los mencionados abogados fueron al Instituto para Jóvenes Adultos de Miramar, en lo sucesivo Anexo Miramar, donde estaba recluido Gilberto Hernández Díaz para entrevistarlo y donde se les habilitó una pequeña oficina para tal propósito. Le dijeron que ellos eran abogados de los Benmuhar y de José A. Tió y que interesaban que él les dijera la verdad de lo acaecido en el edificio de la Delta en la noche del 15 de mayo de 1974, pero le advirtieron que él tenía el derecho a no contestar las preguntas que ellos le formularan. Gilberto accedió a relatarles los hechos ocurridos. Básicamente repitió lo mismo que le había narrado al Fiscal Guillermo

García García, en lo sucesivo Fiscal García, en sus declaraciones del 9 y 17 de septiembre de ese mismo año. [6] En esa ocasión los abogados no llevaron o usaron grabadora alguna. [7]

Durante los siguientes cuatro días los querellados entrevistaron a Jesús Manuel Torres c/p Yuyo o Yiyo [sic] quienes estaban recluidos en la Cárcel la Princesa, a Edgardo Cruz Hernández c/p Guao y a Angel Luis García Colón c/p Willy. Consiguieron además un informe fechado en 6 de julio de 1975 preparado por el CIC en el que se indicaba que el punto de origen del fuego era compatible con ciertos cortes-circuitos que se detectaron en las instalaciones eléctricas de la Delta, y una certificación de la Compañía de Alarmas acreditativa de que a las 11:56 PM del 15 de mayo de 1974 se recibió una señal de fuego y que esta procedía del edificio de la Delta International. [8] Convencidos por la información obtenida de que el caso había sido fabricado por la policía y que los acusados nada tuvieron que ver con lo sucedido en la Delta, decidieron ir de nuevo a entrevistarse con Gilberto Hernández Díaz, a quien en lo sucesivo seguiremos llamando Gilberto.

3. Por sugerencia del Lcdo. Víctor Ramos Acevedo el Lcdo. Francisco Arroyo González se hizo cargo de la defensa de los acusados Jesús Manuel Torres c/p Chuco, [sic] de Marcos Cruz

---

"Escolio [6]

El Lcdo. Francisco Arroyo González no estuvo presente en esa primera entrevista y la que dio lugar a la formulación del primer cargo que se enumera en la querella. Sólo le visitaron los Lcdos. Ramos Acevedo y Vázquez Deynes. En la vista ante este Comisionado declaró que en la entrevista de ese día intervino solamente el Lcdo. Ramos Acevedo, pues éste fue el único abogado que lo visitó. (T.R. páginas 105 y 106; página 331, línea 2.)"

"Escolio [7]

Aparte del testimonio vertido por Gilberto, no se presentó por la parte querellante prueba merecedora de nuestro crédito para contradecir la aseveración de los querellados en el sentido de que ese día no llevaron una grabadora. Como cuestión de hecho el Procurador Rodríguez Ossorio informó a este Comisionado que ellos no tenían grabación alguna de la primera entrevista e ignoraban completamente si se grabó o no se grabó la primera entrevista. (Véase página 331, línea 15 a línea 16 T.R.)"

"Escolio [8]

El fuego, según revela la prueba que se nos presentó, comenzó entre las once y media y las doce de la noche de mayo 15 de 1974. (Véase Ident. C, Qdos., página 277.)"

Canales c/p Pantera y de Angel Luis García Colón c/p Willy. Su primera gestión consistió en hablar con los acusados Torres y Cruz Canales. Este último le informó que la noche del 15 de mayo de 1974 él estuvo trabajando en una empresa llamada Bali y Compañía, situada en el Centro Industrial El Comandante en Río Piedras. El Lcdo. Arroyo le pidió a dicho acusado que buscara alguna prueba o algún documento que evidenciara ese hecho específico, y éste, más tarde, le llevó una carta firmada por Edgardo Colón en la cual certifica que en el turno de noche del 15 de mayo de 1974, desde las tres y media de la tarde hasta las doce de la noche Marcos Cruz Canales estuvo trabajando en la Compañía Bali donde el firmante ostenta el cargo de Gerente de Corte.(⁹) Este testimonio no fue investigado para fines de comprobación ni por los agentes del CIC o del DIE, ni por ningún funcionario del Departamento de Justicia y habiendo sido presentado como prueba por el ministerio público nos vemos precisados a aceptarlo como cierto.

4. La segunda entrevista se llevó a cabo en 14 de junio de 1974 y fue la que dio lugar a la formulación del segundo cargo de la querella. Intervinieron los tres abogados querellados y los reclusos Felipe Jaime Castro y Gilberto Hernández Díaz. El Lcdo. Ramos les informó que tenían una grabadora y se proponían grabar lo que allí sucediera o se dijera y les apercibió otra vez del derecho que ellos tenían a no contestar sus preguntas o a que se grabara su contestación, porque tal como le había dicho en la primera entrevista lo que ellos interesaban era sólo la verdad. Los entrevistados no ofrecieron objeción alguna a contestar y a que se grabara la conversación.

Del detenido estudio que hemos realizado de esta segunda entrevista, fielmente transcrita en el Exhibit 1 de ambas partes y de la apreciación que hemos hecho de la forma en que fue conducido el interrogatorio por el Lcdo. Víctor Ramos Acevedo,(¹⁰) salvo infrecuentes y cortos interrogatorios de los Lcdos. Vázquez Deynes y Arroyo González, así como del tono de las voces de los

---

"Escolio (⁹)

A dicha carta se unió copia fotostática de la tarjeta de entrada y salida del empleado."

"Escolio (¹⁰)

De los tres abogados querellados el que más experiencia tenía como abogado criminalista era el Lcdo. Ramos Acevedo."

querellados y testigos que por tres veces hemos escuchado, llegamos a la conclusión de que dichos letrados dirigieron el interrogatorio con firmeza y determinación y fueron persistentes y minuciosos durante el interrogatorio a que sometieron a dichos testigos. Le confrontaron con la evidencia e informaciones que en su investigación habían obtenido, le señalan las contradicciones en que había incurrido e insistieron en que les dijera la verdad.

Se suscita, según la grabación, el siguiente incidente:

'Lcdo. Ramos Acevedo:

¿Pero tú sostienes que Willy estaba contigo? Mira, te lo digo esto, porque una de las causas por lo que nosotros estamos grabando aquí es porque nosotros vamos a volver a ver a Willy y vamos a que él oiga la grabación ésta que estamos haciendo de lo que tú dices. Porque él dijo que quería que tú le dijeras a él, en la cara, o sea, ahí, confrontarlos a ustedes, que tú le dijeras a él a ver si era verdad que él estaba porque él no estaba ni él sabía nada de eso, porque se había quedado por allá ese día, por allá por Monte Hatillo.

Gilberto:

Yo sé donde es Monte Hatillo, yo siempre me pasaba en Monte Hatillo.

Lcdo. Ramos Acevedo:

Está bien, por eso te digo. Pero ahora él dice que no estaba esa noche contigo y tú dices que él estaba. ¿En qué quedamos? El estaba . . . .

Gilberto:

Si el hombre quiere que yo lo defienda, pues yo . . . . .

Lcdo. Ramos Acevedo:

No, no, no es que tú lo defiendas, es que tú digas la verdad, si estamos aquí buscando la verdad.

Gilberto:

Seguro.'

(Exhibit 1 de ambas partes, transcripción de la grabación de la segunda entrevista, página 17, línea 13, hasta la línea 24; y página 18, línea 1 hasta la línea 12.)

Luego el Lcdo. Ramos Acevedo le sigue aconsejando por qué debe siempre decir la verdad (página 19) y continúan hablando sobre otros extremos hasta la página 33 de la referida transcripción. A la línea 9 de esta página Ramos Acevedo formula la siguiente pregunta:

'Lcdo. Ramos Acevedo:

Está bien, ok. ¿Willy no estaba?

Gilberto:

No.

Lcdo. Ramos Acevedo:

¿Tú aseguras que Willy no estaba?

Gilberto:

No estaba.'

Más adelante consideraremos este incidente conjuntamente con todas aquellas conclusiones de hecho a que arribemos y que estén relacionadas o tengan pertinencia con el mismo.

En esta segunda entrevista Gilberto describió los hechos que sucedieron en la Delta en forma distinta a como lo hizo luego a los abogados en la primera entrevista y a como se los había descrito al Fiscal García (Exhs. 10-B y 10-C, Qdos.). Dijo que él fue solo a buscar los 'trucks' a la American Metal Corp., que primero sacó uno y lo llevó al caserío, regresando en una guagua pública a buscar el otro (páginas 25 a 29, transcripción de la grabación); que quién guió el otro 'truck' al regresar con los televisores fue Guao, (Edgardo Cruz Hernández) (página 31, línea 13)—antes dijo que había sido Yiyo (José Manuel Torres); que los que entraron a Delta fueron Yiyo y Marcos Cruz Canales (Pantera)—(página 33, línea 19)—antes dijo Willy y Pantera; que en el incendio no estaba Willy ni Chucho, Marcos ni Pipo (página 38, línea 5)—antes afirma que todos habían participado en el robo y el fuego;—que el CIC le llevó a Gilberto la declaración que Guao había prestado y él se dejó llevar por lo mismo que había declarado Guao, y el CIC 'aprieta a uno' (página 50, línea 1)—antes no había declarado sobre ese extremo; que él estaba dispuesto a decir la verdad, pero que el CIC no se le tirara encima otra vez (página 50, línea 1)—esto lo dice por primera vez—; que supo que había fuego al otro día por el periódico, (página 57, línea 13); antes dijo que había visto el fuego cuando regresaba de llevar los televisores y porque Willy se lo dijo al otro día—; que había dejado los televisores en un pastizal que había detrás de la casa de Doña Rosa (página 75, línea 24 y página 76, línea 1)—antes dijo que los dejaron en casa de Doña Angela—; que Guao dejó abandonada la guagua en Barrio Obrero, según le informó el CIC (página 76, líneas 9 y 14)—antes dijo que habían llevado ambos 'trucks' a la American Metal Corp.; que los policías le iban a dar chavos por testificar

(página 43 et seq.) ; que el Agente Ortiz le dio una pela (página 45, línea 4 hasta línea 15) ; que le dieron la misma noche que lo arrestaron, lo revolcaron contra las sillas, que si no se lo quita Donato . . . . (página 46, línea 8)—nada de lo cual antes había declarado—; que el CIC siempre lo amenazaba porque como él andaba fuga'o de Mayaguez y tenía otros casos. . . . . . (página 51, líneas 5 y 7)—no declarado antes—.

Observamos que Gilberto contestaba las preguntas que le formulaban espontáneamente, con rapidez y sin titubeos.

Una y otra vez los abogados le informaron a Gilberto que su propósito era llevarle al Fiscal García las grabaciones para tratar de convencer a este funcionario de que iniciara una nueva investigación en la cual no interviniera ningún agente del CIC o del DIE, y le preguntaron si él estaba dispuesto a ir a donde dicho fiscal y relatar los hechos tal y como en realidad habían sucedido y él contestó en la afirmativa, con la condición de que no estuviera presente el CIC. En efecto, después de la entrevista visitaron al Fiscal García y le entregaron la grabación. (¹¹)

5. La tercera entrevista se llevó a efecto el día 17 de octubre de 1974 en el Tribunal Tutelar de Menores. Compartieron en ella los tres querellados quienes fueron acompañados por Doña Angela Hernández, madrastra de Gilberto y la persona que se ocupaba de comparecer en corte en sustitución de sus padres cuando éste se veía envuelto en algún asunto de naturaleza criminal, y el propio Gilberto.

Tomó la iniciativa el Lcdo. Ramos Acevedo advirtiéndole de su derecho a no contestar las preguntas que ellos le hicieran o a que se utilizara la grabadora que él llevaba consigo. Le informó además que en la mañana de ese día él había ido a casa de Doña Angela para hablar con su hijo Edgardo Cruz Hernández c/p Guao, y éste en presencia de su madre Doña Angela, le dijo una serie de cosas que no concordaban con lo que él, Gilberto, le había expresado en las anteriores conversaciones; que él había llegado a la conclusión de que en parte de lo que les dijo había mentido;

"Escolio (¹¹)

La grabación nunca fue enseñada a Willy. El Fiscal García declaró que en relación con este asunto quien con más frecuencia lo visitó fue el Lcdo. Víctor Ramos Acevedo, quien le informó que estaba convencido de que el caso fue fabricado por los agentes del CIC, y le enumeró las averiguaciones que él había hecho a través de la investigación que él y sus compañeros habían practicado. (Página 311, línea 10.)"

que habían traído a Doña Angela y le pidió que hablara con ella.

Esta señora le dijo a Gilberto que él sabía que ese hombre era inocente; que recordara que esa noche él estaba acostado en su casa; que cuando oyeron las sirenas de las bombas de incendio Guao lo despertó a patadas y le dijo: 'Mira, fuego, fuego'; que ese hombre no pegó fuego. Gilberto contestó que lo que ella decía era cierto; que esa noche iban ambos para el bingo. Continuó Doña Angela diciendo que recordara también que esa noche, como a las ocho, que es la hora que ella sale para el bingo, llegó el hermanito de Carmen, hijo de Doña Rosa, a buscarlo para que fuera a casa de su padrastro. (Exh. 1, ambas partes, página 89.) Gilberto aceptó que también eso era cierto y añadió que al llegar a casa de Doña Rosa él y el padrastro de Carmen se fueron en el 'truck' de este último a recoger unas gomas de 'trailer' que él le había vendido y que tenía escondidas en un pastizal; que llevaron las gomas a Villa Carolina; el señor que le acompañaba le pagó por ellas y él regresó a casa de Doña Rosa donde se quedó un rato y después volvió a casa de Doña Angela y se retiraron a dormir él y su esposa; que al rato llegó Doña Angela y él le abrió la puerta y se acostó de nuevo. Más tarde Guao lo despertó y gritó: 'Mira, fuego, fuego' y ambos fueron donde estaba el fuego; que cree que los del CIC, que andaban por allí, lo vieron pues al otro día por la mañana lo fueron a buscar.([12])

El Lcdo. Ramos Acevedo le preguntó por qué él le había declarado al Fiscal García que él había entrado a la Delta a robar esa noche. Contestó que el CIC lo amenazó porque él andaba fugado de Mayagüez; que lo habían cogido con vehículos hurtados; que tuvo un problema con un sargento de Inteligencia

---

"Escolio ([12])

Cuando Gilberto declaró ante el Fiscal Oquendo en 12 de agosto de 1975, éste le indicó que Doña Angela alegaba que la noche del fuego ella salió para un bingo y que él, Gilberto, iba a ir con ella, pero lo vino a buscar el esposo de Doña Rosa Silva. Le pregunté si eso era cierto. El contestó: 'Es cierto todo eso excepto que eso no ocurrió el día del fuego como ella cuenta. Eso ocurrió un sábado por la noche a las nueve antes del día del fuego.'

Lo cierto es que no fue un sábado por la noche que ocurrió el fuego, ni que lo despertaran a patadas, ni que le gritaran, 'Mira, fuego, fuego'. Eso ocurrió el miércoles 15 de mayo de 1974. (Véase Exh. 10-E, Qdos., página 16, línea 1.)"

sobre un vehículo que había robado y al cual le dio un cantazo; que los agentes le dijeron que lo que ellos querían averiguar era 'sobre el incendio ese'; y que como ellos siempre andaban en grupo, los culparon a ellos.

El Lcdo. Ramos le preguntó si él estaría dispuesto a ir ante el fiscal si este lo llamaba y él contestó que si no iban agentes del CIC o policías él diría la verdad al fiscal. (Páginas 107 hasta 114, transcripción.)

En esta entrevista ocurrió el incidente que a continuación someramente pasamos a describir. Mientras Gilberto era interrogado por los querellados, un alguacil del Tribunal, creyendo que la grabadora que el Lcdo. Ramos tenía en sus manos era una cámara, informó al Lcdo. Richard Markus, quien era abogado de la Clínica de Asistencia Legal de la Universidad de Puerto Rico y estaba ese día a cargo de la defensa de Gilberto en un caso de Hurto Mayor por el cual éste era acusado, que le parecía que unos abogados o policías estaban retratando e interrogando a su cliente. El Lcdo. Markus se dirigió hacia ellos y mientras Gilberto estaba contestando una pregunta interrumpió diciendo en alta voz: ([13])

'Lcdo. Markus:

'Cállate la boca un momentito, espérate.'

Luego se identificó como abogado de Gilberto en todos los casos que tenía pendientes ese día. El Lcdo. Ramos Acevedo se identificó, le presentó a sus dos compañeros y le explicó las razones por las que le estaban entrevistando. Continuó la discusión, las voces subieron de tono y se creó la consiguiente confusión hasta que intervino el Hon. Juez Alvarez de la Vega y dio fin al incidente terminando todo en forma cordial. El magistrado le concedió cinco minutos más a los querellados para terminar la entrevista. (Páginas 100 a 105, Exh. 1 ambas partes.)

Durante su testimonio ante nos se le preguntó al Lcdo. Markus por el Lcdo. Enrique González si después del incidente había hablado con su cliente, y si éste se le había quejado de la conducta de los querellados o si había sido víctima de alguna amenaza por parte de éstos. El Lcdo. Markus contestó que había

---

"Escolio ([13])

El tono de la voz, según la grabación, así lo indica. (Véase Exh. 1 ambas partes, página 100, línea 15.)"

hablado con Gilberto pero que éste no había hecho comentario alguno en relación a lo ocurrido en la entrevista.

Continuó el abogado defensor e inquirió si pudo apreciar cómo estaba Gilberto frente a los tres abogados y él respondió que su impresión en aquel momento era 'como perdido, desorientado, confundido, algo que se queda corto antes de intimidado, un poquito más que confuso antes que intimidado', 'lo veo allí sentado con éstas tres personas que incluso van por encima de él físicamente, contestando las preguntas.' Continúa diciendo que contestaba las preguntas simultáneamente, pero no interrumpiéndose uno con el otro. . . . . le dirigen preguntas según se le van ocurriendo. ([14])

Tan pronto terminó la entrevista los querellados entregaron al Fiscal García la grabación de la misma y reiteraron su petición de que llamara al testigo nuevamente, ya que éste estaba dispuesto a declarar la verdad, siempre que no estuvieran presentes los agentes del CIC ni ningún otro agente de la policía.

(5) [sic] El testigo Gilberto Hernández Díaz declaró ante el Fiscal García el 4 de noviembre de 1974 que había recibido tres visitas de los abogados querellados. En la primera él les dijo la verdad de cómo habían sucedido los hechos, tal como se lo había relatado al Fiscal García.

Que en la segunda él les había dicho cosas distintas para que no volvieran más porque la primera que él les dio se la llevaron a Willy, quien estaba recluido en el presidio y él había

---

"Escolio ([14])

Hemos examinado la transcripción de esta tercera entrevista página por página y encontramos que el Lcdo. Vázquez Deynes habló una sola vez durante toda la entrevista, no para dirigirse a Gilberto, sino para aclararle al Lcdo. Markus que ya ellos habían hablado con el Juez Alvarez de la Vega.

Lo mismo ocurrió con el Lcdo. Arroyo González. A la página 89, línea 9, por primera vez interviene y le pregunta a Doña Angela si Tato, Edgardo, es hijo de ella. A la página 90, línea 14, le dice a Gilberto: 'Tú sabes la verdad, lo que hiciste verdaderamente.'; y a la página 92, líneas 9 y 11 le pregunta a Gilberto, '¿Y qué hiciste?' y '¿Qué pasó?' respectivamente. Con excepción de esas cuatro intervenciones, Ramos Acevedo condujo el interrogatorio en su totalidad.

No alcanzamos a comprender cómo y por qué el Lcdo. Markus captó la impresión de que Gilberto estaba entre confundido e intimidado por razón de que los abogados le hacían preguntas simultáneas y una tras otra, según se les ocurrían, si el único que se estaba dirigiendo a él, mientras Markus estaba presente, era el Lcdo. Ramos Acevedo."

recibido varias amenazas en el Anexo, amenazas que había recibido después de la primera visita de los abogados. Que en la tercera visita los letrados le pidieron que dijera la verdad para ayudarlos a ellos y ayudarle a él en su situación económica, y si acaso él tenía otro caso, ellos podían representarlo en corte.

En esa declaración no habló sobre el incidente de las puñaladas. (Exh. 10-D, Qdos.)

En la declaración prestada ante el agente especial del DIE, Angel Luis Ocasio, en febrero 14 de 1975, tampoco mencionó que había sido víctima de una agresión en la madrugada del 9 de mayo [sic] de 1974. (Exh. 10, Qdos.)

Por primera vez, mientras declaraba ante el Fiscal Ramón A. Cestero en mayo 29 de 1975, y a preguntas de este funcionario, describe lo sucedido en dicha madrugada. Dijo que recibió dos puñaladas, una en el cuello y otra en una mano y que Caobo, amigo de Willy, fue el autor de la agresión. (Exh. 10-D, Qdos., páginas 3 y 5.)

Declaró además que el Lcdo. Ramos Acevedo le había dicho que si no declaraba la verdad le iba a llevar la grabación a Willy para que este la oyera; que después que Willy la oyó fue que le dieron las puñaladas. (Página 4.)

En la declaración prestada ante el Fiscal Oquendo en agosto 11 de 1975 (Exh. 10-E, página 12, línea 1) dijo, entre otras cosas, que no recordaba si las puñaladas se las dieron antes de las entrevistas, pues había mucha confusión en esos meses, y que quienes le hirieron fueron Caobo y Crucito, amigos de Willy.

7. En la última declaración escrita y jurada prestada por Gilberto ante la Hon. Procuradora General en 12 de noviembre de 1975 y en relación con el incidente de las puñaladas (Exh. 10-F, Qdos., página 8, línea 11), cuando el Lcdo. Serra le preguntó si estando en alguna institución recibió una agresión, Gilberto contestó que sí había recibido las heridas después que los abogados querellados le dieron la grabación a Willy. Repite y elabora lo sucedido en esa ocasión en que fue atacado, (páginas 15 y 16) y primero dice que fue después de la segunda grabación y enseguida corrige y dice que fue después de la primera, cuando se llevaron la grabación para enseñársela a Willy; que sabe que Willy la oyó porque se lo dijo en el presidio cuando él fue a curarse las heridas. [15]

"Escolio [15]
Durante la vista ante nos (T.R. página 253, línea 10) el Procurador

La afirmación de que él recibió las puñaladas después que oyó la grabación que le llevaron los querellados es totalmente falsa. Le infirieron las puñaladas un mes antes de la primera entrevista, cuando aún los abogados no se habían hecho cargo de la defensa de los acusados y cuando todavía los Lcdos. Ramos Acevedo ni Arroyo González conocían a éstos.

8. La evidencia nos ha convencido que como cuestión de hecho Gilberto no le tiene ni nunca le ha tenido miedo a Willy. (T.R. página 81, línea 1.) No abrigó temor alguno a Willy ni a sus amigos cuando ocho a nueve horas después que dos amigos de Willy lo apuñalearon fue ante el Fiscal García y acusó a Willy y a sus compañeros de haber incendiado la Empresa Delta.

Tampoco tuvo miedo a las consecuencias que pudieran sobrevenir cuando se prestó, cinco días después de la fecha del incendio, a servir como testigo de cargo en contra de Willy. ([16])

Nunca ha tenido miedo de exponer su vida y su libertad en la continuada y peligrosa carrera del crimen a que ha dedicado esa corta vida. Se trata de un individuo difícil de ser amedrentado.

Por otro lado incurrió en innumerables y fundamentales contradicciones que convierten sus distintas declaraciones y el testimonio prestado ante nos en una increíble farsa. Su forma de declarar, sus gestos, sus titubeos y su cínica sonrisa cuando se le atrapaba en una falsedad o cuando creía que había engañado con éxito a sus interrogadores, es todo expresivo de una conducta insensata e irrespetuosa hacia la verdad, la moral y la responsabilidad ciudadana. A nuestro juicio se trata de un prevaricador compulsivo que no es digno ni merecedor de nuestro más mínimo crédito.

Mientras Gilberto declaraba ante nos nunca afirmó, ni siquiera insinuó, que los querellados le ofrecieran dinero, le hicieran promesas, o le sugirieran que variara su declaración original prestada ante el Fiscal García, ni que directamente le amenazaran en forma alguna sobre algún extremo de dicho testimonio.

---

Rodríguez Ossorio se dirigió a este Comisionado y alegó que en ningún momento en su informe ni en ningún otro lugar ellos hicieron referencia alguna al incidente de las puñaladas. Evidentemente había olvidado que Gilberto había declarado a preguntas del Lcdo. Serra los hechos que hemos reseñado en el párrafo anterior. (Exh. 10-F, Qdos.)"

"Escolio ([16])

Este se declaró culpable y fue sentenciado a tres meses de cárcel."

El único incidente sobre el cual descansan los procuradores para sostener su imputación de que los querellados presionaran y/o instigaran y/o amenazaran al testigo de cargo para que alterara su testimonio y así favorecer a sus representados se limita a lo que antes hemos copiado en nuestras Determinaciones de Hechos número 4, o sea, la observación que el Lcdo. Ramos Acevedo le hace en la segunda entrevista de que le va a llevar la grabación a Willy para que éste la oyera, de modo que él, el abogado, pudiera confrontarlos a ellos dos, ya que Willy sostenía que él no estaba ni sabía nada de eso—en el incendio—porque esa noche él estaba con una muchacha en Monte Hatillo. (Exh. 1 de ambas partes, página 17, línea 13 hasta línea 24.)

La reacción de Gilberto al terminar el Lcdo. Ramos Acevedo, fue decir lo siguiente: 'Yo sé donde es Monte Hatillo, yo siempre me pasaba en Monte Hatillo.'

El Lcdo. Ramos Acevedo entonces le informó que Willy mantenía que él no estaba esa noche en el incendio y él, Gilberto, insistía en que sí estaba, que en qué quedaban, '¿estaba o no estaba?'

Gilberto: 'Bueno, si el hombre quiere que yo lo defienda, pues yo . . . .'

Ramos Acevedo: 'No, no, no es que lo defiendas, es que tú digas la verdad, si estamos aquí buscando la verdad.'

Gilberto: 'Seguro.'

En la segunda entrevista al preguntarle el Lcdo. Ramos Acevedo a Gilberto si Willy había penetrado a la Delta, Gilberto le explicó que Willy estaba con él, pero él estaba en el 'parking' de atrás y Willy en el frente, y él no se fijó si Willy entró. En ese punto es donde el Lcdo. Ramos le indica que él va a llevar la grabación a Willy.

Como es natural, cuando leímos y analizamos lo que aparece transcrito de esa segunda entrevista no pudimos percibir en qué actitud estaba y en qué tonalidad se expresó el abogado al dirigirse a su entrevistado en los términos apuntados. Podemos afirmar, luego de oída nuevamente la grabación, que la conversación se estaba llevando a cabo en un ambiente tranquilo y normal.

No nos fue posible captar ni del texto escrito de la transcripción ni de la grabación misma indicio alguno por parte de los querellados que nos moviera a creer que las palabras del quere-

llado fueran pronunciadas en forma de amenaza o en tono amenazante.

10. La vista preliminar de los tres casos radicados fue celebrada el día 8 de noviembre de 1974. Al llamarse el caso el Fiscal García solicitó del Tribunal que por la Regla 247, en bien de la justicia, se determinara que no había causa probable en los delitos que envolvían fraude o tentativa de fraude—Art. 478, Cod. Penal—y en el de presentar una reclamación falsa o fraudulenta—a virtud de una póliza de seguro—Art. 479, Cod. Penal. (T.R. página 317, línea 2.)

Esta solicitud no tuvo nada que ver con la declaración o cambio de declaración de Gilberto Hernández, porque esos cargos se iban a sostener con la declaración de otros testigos. (T.R. página 325, línea 9.)

La defensa se opuso a que se archivaran los cargos pero el Juez sostuvo al fiscal y ordenó el archivo y sobreseimiento de los mismos. (T.R. página 317, línea 12.)

A pesar de que Gilberto habló con el Fiscal García el día de la vista, leyó la declaración jurada prestada en 9 de septiembre de 1974 y le aseguró que esa era la verdad, cuando ocupó la silla de los testigos dio una declaración distinta a lo que originalmente había depuesto. (T.R. 315, líneas et seq. [sic].)

En la declaración prestada ante el Fiscal Oquendo, dijo que las razones que tuvo para cambiar su testimonio en la vista preliminar consistieron en que cuando lo llevaron a la Corte de Distrito en la Parada 3 lo pusieron en la Sala 10, junto a los otros acusados entre los cuales habían confinados que lo amenazaron para que cambiara su declaración y que si él no los favorecía no podría vivir para contarlo. Al Fiscal Cestero le explicó que el cambio se debió a que lo juntaron con Willy y sus amigos 'en la boca del león' y no tenía alternativa 'si decir que sí o que no'. Además Willy y la mamá y la esposa de Guao le pidieron que cambiara su declaración. (Exh. 10-A, página 6-A, línea 8 et seq.)

Los abogados querellados no estaban presentes mientras se proferían estas amenazas y se ofrecían estos consejos.

Luego de oída la prueba ofrecida por el fiscal, el Juez decretó el archivo de la acusación.

Los abogados querellados gozaban de una excelente reputación en cuanto a honestidad, rectitud, talento, responsabilidad

profesional y respeto a los tribunales. ([17]) El propio fiscal García reconoció que el Lcdo. Ramos Acevedo estaba considerado responsable y serio.

El Juez Cintrón García testificó que siente orgullo de ver que hubiese abogados que tuviesen tanto sentido del decoro, del respeto, de la elegancia, como lo tienen estos tres abogados.

El Lcdo. Joaquín Monserrate Matienzo, quien ha ocupado los cargos de Fiscal Especial del Departamento de Justicia, Fiscal Auxiliar del Estado Libre Asociado y Fiscal Auxiliar Federal califica la reputación de los querellados como intachable y afirma que sus compañeros abogados, inclusive abogados adversarios en el sentido profesional que practican ante los tribunales de Puerto Rico y de la Corte de Distrito de los Estados Unidos comparten ese criterio.

La Sra. Morales Vizcarrondo, Secretaria del Tribunal Superior, afirma que estos profesionales están reputados en la comunidad profesional como buenos abogados, serios y responsables.

Preguntado el Hon. Fiscal Alcides Oquendo si conociendo todo lo que ha transcurrido desde el fuego Delta hasta el presente, él recabaría los servicios del Lcdo. Ramos Acevedo, contestó que en consideración al conocimiento que tiene de la persona del Lcdo. Ramos a través de la relación personal y profesional con él en el transcurso de diez años, él recabaría sus servicios.

Las partes estipularon que de haber comparecido los jueces, fiscales, abogados y personas particulares relacionadas en la moción informativa que obra en autos—120 por todos—hubieran testificado sobre la buena reputación de que gozaban estos tres abogados en la comunidad."

■ *A la luz de las meticulosas conclusiones y determinaciones transcritas, es ineludible nuestro deber de exonerar a los abogados querellados de los cargos específicos que les fueron formulados, quienes enmarcaron sus acciones dentro de los límites éticos permisibles vigentes.*

El Juez Asociado Señor Rigau no intervino.

---

"Escolio ([17])

Véanse declaraciones del Hon. Juez Cintrón García, de la Sra. Doris Morales Vizcarrondo, del Lcdo. Joaquín Monserrate Matienzo y del Fiscal Alcides Oquendo."